Argued May 7, reversed and remanded with directions July 31,
petition for rehearing denied September 6, 1956

# BURGIN ET UX *v.* PENDLETON COUNTRY CLUB
300 P. 2d 444

*John F. Kilkenny* and *George H. Corey,* Pendleton, argued the cause for appellant. On the brief were George H. Corey and Kilkenny & Fabre, Pendleton.

Dixon, Burleigh & Swindley, La Grande, filed a brief for respondents.

Before WARNER, Chief Justice, and TOOZE, LUSK and BRAND, Justices.

TOOZE, J.

This is an action for damages for alleged breach of a contract brought by C. A. Burgin and Enda E. Burgin, his wife, as plaintiffs, against Pendleton Country Club, Inc., an Oregon nonprofit corporation, as defendant. The case was tried to the court without intervention of a jury. Judgment was entered in favor of plaintiffs and against defendant for the sum of $4,000. Defendant appeals.

Defendant is a nonprofit corporation organized pursuant to the provisions of ORS 61.010 to 61.130, inclusive, with its principal office located at Pendleton, Umatilla county, Oregon. It owns and operates a Golf and Country Club. At all times material to this litigation, one J. David Hamley was the president, and one Emil F. Piluso was the manager, of the defendant corporation.

Plaintiffs are husband and wife and the owners of approximately 100 acres of land located in the vicinity of Pendleton.

In 1954, defendant contracted to sell the land composing its then existing Golf Course and Country Club property to the local school district, and was in the market to purchase a new site for its operations. Acting through its Board of Directors, defendant became interested in the real property owned by plaintiffs. Plaintiffs had listed their property for sale with the Oscar Schultz Real Estate Agency of Pendleton for the sum of $50,000. In the form of a written earnest money receipt, defendant's Board of Directors offered to purchase plaintiffs' property for the sum of $40,000, subject to the approval of the membership of defendant. The offer was executed on behalf of defendant by J. David Hamley, as President, and Emil F. Piluso, as Manager. On July 23,

1954, plaintiffs accepted the offer of defendant and signed the earnest money receipt by which they agreed to sell their property to defendant according to the terms of the agreement.

Upon the execution of the earnest money receipt containing its offer to purchase plaintiffs' land for the sum of $40,000, defendant accompanied the same with its check for the sum of $4,000 as earnest money. The earnest money receipt provided that in the event defendant should refuse to carry out the agreement upon its acceptance and compliance with its terms by plaintiffs, the $4,000 was to be forfeited as liquidated damages. On or about October 1, 1954, the defendant notified plaintiffs that it would not purchase the property and stopped payment upon its check for $4,000. This action was commenced to recover that sum of money as liquidated damages for alleged breach of contract.

The earnest money receipt executed by the parties contained the following express provision:

"This sale is contingent upon acceptance by the club membership, and if this sale should not be ratified and approved by the membership of the purchaser [defendant] within 90 days from date, then all money heretofore paid by purchaser shall be immediately paid and reimbursed to purchaser and this agreement shall be null and void and of no effect."

■ At the outset, it should be stated that under the statute of this state (ORS 61.060), the Board of Directors of defendant is deemed the body corporate, and has the power to purchase, receive and dispose of real property. With respect to the proposed purchase of plaintiffs' lands, the Board of Directors of defendant was not required to first submit the question

to the membership of the Golf Club for approval; it could have acted without regard to the wishes of the membership. However, the Board also had the power to attach to its offer of purchase any conditions it saw fit to impose. In the instant case, defendant, as a condition precedent to a binding contract of sale and purchase, imposed the provision in the agreement that the proposed purchase should first be ratified and approved by the membership. It is manifest, therefore, that no binding contract of sale and purchase could come into being until and unless the proposed purchase by defendant was so ratified and approved.

Considering the agreement as a whole, we are of the opinion that it was the intent of the parties thereto that as a condition precedent to a binding contract of sale and purchase, ratification and approval thereof by a majority of all members of defendant in good standing was necessary. At the time, 242 persons comprised the membership of defendant, and it would require the favorable vote of 122 or more thereof to constitute the necessary and required ratification and approval as provided in the agreement. However, the disposition of the matter before us does not require this interpretation of the contract between the parties.

As the basis of its action to recover liquidated damages from defendant, the burden was upon plaintiffs to prove that a binding contract of sale and purchase had been entered into between the parties. Hence, it was incumbent upon plaintiffs to establish by the evidence that the proposed purchase of their lands by defendant had been "ratified and approved by the membership" of the Golf and Country Club. No burden rested upon defendant to prove that it had not been so ratified and approved.

The only evidence offered by plaintiffs to estab-

lish such ratification and approval by the membership of defendant consisted of the minutes of a special meeting of such membership held on August 6, 1954. The minutes show that this meeting was held "pursuant to notice mailed to the members on July 31, 1954." The minutes then state: "It was noted that a quorum was not present and that a quorum had not been present at the previous membership meeting." However, an examination of the duly adopted By-Laws of defendant fails to disclose any provision as to what shall constitute a quorum of the membership for the transaction of business. It would seem, therefore, that in speaking of a quorum not being present, the minutes had reference to a majority of the members of the organization. But, as noted, the By-Laws are silent as to what shall constitute a quorum.

According to the minutes, there was considerable discussion among the members present respecting proposed sites for the new Golf Course, including the property of plaintiffs. The minutes disclose the following:

"President Hamley explained that this meeting was called to inform the membership on the research the Board had done regarding the purchase of proposed properties for a new club house and golf course. President Hamley stated 'we don't buy new courses but once in a life time and since the January 20 meeting, many things had happened to change the thinking on sites', and that 'the Burgin property as described in the President's Letter (June-July, 1954) was now to be considered.' * * * * *

"General discussion from the floor: Rube Leslie asked if there weren't some other places to be considered to which President Hamley replied that reasonably thorough investigation had been made and that 'it appears at this time that the Burgin

property best meets our needs, and had a future possibility of selling lots for residences.' Finis Kirkpatrick asked about the Babcock property (Airport on old Highway 30). President Hamley said they were not sure the Babcock property could be had; and that the water problem was too great and again felt that the Burgin property appeared most desirable. Dr. J. P. Brennan moved *'that the Board be authorized to negotiate for purchase of the Burgin site if they deem it feasible and to complete negotiations with the School Board of District 16C,'* seconded by J. Milne. *92 members cast their secret ballot as recorded on the membership roster.* The President announced that there were 70 votes cast for the Burgin property and 20 NO—because a majority of the membership did not cast votes, and a quorum was not present, President Hamley announced that a ballot would be in the mail the next week.'' (Italics ours.)

From the foregoing, it is obvious that the vote taken at this special meeting of the membership was not considered as an approval of the purchase of the Burgin property, but was specifically rejected as such, and a mail poll of the entire membership was proposed in lieu thereof. Such poll of the membership was taken by mail and the proposed purchase of the Burgin property was rejected by a vote of approximately 5 to 1.

■ Plaintiffs' case must stand or fall upon the action taken at the special meeting of the membership held as above noted. It is observed that the notice for such special meeting was mailed to the members of the defendant on July 31, 1954, *one week prior to the date of the meeting.*

With respect to special meetings of the membership of defendant, the By-Laws provide:

"Special meetings of the Club may be called at any time by the President in his discretion, and

shall be called at any time upon written request of fifteen members having the right to vote. Notice of any special meeting shall state the purpose of such meeting, and shall be sent by the Secretary to each member having the right to vote, by mail, *ten days* prior to the time of holding such meeting, and no business shall be transacted at a special meeting other than that stated in the notice thereof." (Italics ours.)

Seven days' notice only was given as to the special meeting of August 6, 1954. To make any special meeting a valid meeting, ten days' prior notice is required. It is clear, therefore, that the alleged special meeting of August 6, 1954, was not a valid meeting, and any business transacted thereat could have no binding force or effect whatever upon the membership.

However, plaintiffs argue that they are not bound by the By-Laws of defendant of which they had no personal knowledge. This theory was embraced by the able trial judge in his disposal of the case before him. We quote from his memorandum opinion the following:

"* * * Plaintiffs were not and never had been members of the Pendleton Country Club and were unaware of the By-Laws of the corporation. In general, By-Laws are for the purpose of regulating the conduct of and to define the duties of the members toward the corporation and between themselves and have no binding force upon anyone a stranger to them. *Thus, a corporation cannot set up its By-Laws as a defense against a third person who had no knowledge of them.* 9 Fletcher, Corporations, Perm. Ed. § 4277.

"Members of a corporation are, as a general rule, chargeable with knowledge of its by-laws and cannot plead ignorance of them to avoid their operation: 14 C.J., p. 347. But third persons are not bound to know of them: 2 Cook

on Corporations (4th Ed.), § 725; 1 Machen on Modern Law of Corporations, § 736.

" 'A party contracting with a corporation,' says Cook, 'is not bound to know of restrictions in the by-laws as to the method of authorizing and executing contracts, nor is he bound to take notice that a quorum of the directors was not present when the act was authorized': 2 Cook on Corporations (4th Ed.), § 725." *Doehler vs. Lansdon,* 135 Or. 687, 698; 291 P. 392, 298 P. 200.

"While there are dicta broadly to the effect that the by-laws of a corporation are binding, not only on corporators, but also on persons dealing with the corporation, the great weight of authority is against giving to by-laws the force and effect against a third person dealing with the corporation as a stranger and at arm's length that is implies [sic] in such statements.

"It has been said that a by-law has no extracorporate force, and is only binding on those dealing with the corporation who have notice of it, or who deal with the corporation under such circumstances that they are bound to take notice of it, and that by-laws 'are not in the nature of legislative enactments, so far as third parties are concerned.' " 8 Fletcher, Corporations (Perm. Ed.), § 4199.

*"Thus, the Burgins, as strangers to the Pendleton Country Club, are not affected by the fact that notice required by the Club's By-Laws was not given sufficiently in advance of the membership meeting."* (Italics ours.)

██ We have no quarrel with the principles of law above stated. But it is manifest that the rules are applicable only when a corporation itself, or a member thereof, attempts to set up the By-Laws as a defense against the claim of a third person who had no knowledge of them. But that is not the situation in the in-

stant case. Here, the plaintiffs are seeking to take advantage of and base their entire right upon what occurred at an alleged special meeting of the membership of defendant. Plaintiffs must necessarily look to and rely upon the By-Laws of defendant in establishing the fact that a valid special meeting as provided in the rules for the government of defendant was called and held. Defendant is not in the position of offering the provisions of its By-Laws as a defense to plaintiffs' claim. Proof of a valid meeting of the membership of defendant at which the proposed purchase of plaintiffs' property was ratified and approved is a necessary part of plaintiffs' case in chief. In the light of the specific requirements of the By-Laws of defendant as to special meetings of the membership, it is manifest, as above stated, that the special meeting held on August 6 was not a valid meeting. Plaintiffs, who had the burden of proof in establishing as a condition precedent to the existence of a binding contract of sale and purchase, and to their right of recovery, ratification and approval of the proposed purchase by the membership of defendant, wholly failed to discharge that burden. The view we take of this case renders unnecessary a discussion as to whether or not the action taken at the alleged special meeting would have constituted ratification and approval by the membership within the meaning of the agreement had the meeting been a valid one. Under the facts and circumstances of this case, plaintiffs were not entitled to recover damages from defendant.

The judgment is reversed and this cause remanded with directions to enter judgment in favor of defendant.